# J. P. Boyce, Executor, etc., v. J. C. Stanton et al., and other consolidated causes.

1. **Vendor and Sub-purchasers.** *Release of lien.* A. sold to B. a tract of land, which B. cut into lots, and sold the most of them to various sub-purchasers, before he had himself obtained title. After decree of sale to enforce his lien, directing that the portion still held by B. should be first sold, A. released B.'s portion, sufficient in value to pay off his lien, having notice of the sale of the rest to sub-purchasers. *Held,* that A. thereby waived and released his lien on the lots of sub-purchasers.

2. **Same.** *Same. Date of estimated value.* The value of the part released, after such decree, estimated in this case as of the date of the release. The fact that B. had quadrupled the relative value of his portion after the purchase, or doubled it after the decree and before the release, does not affect the rule; the full value of the property first liable must be credited as against sub-purchasers.

3. **Same.** *Same. Vendor and mortgagee.* The vendor with a lien occupies toward sub-purchasers from the vendee, and subsequent encumbrances, the same relation as would a first mortgagee to second mortgagee.

4. **Same.** *Purchase pendente lite.* One who purchases portions of such land during the pendency of the vendor's suit to enforce lien, is entitled to the same protection as one who bought before suit brought, provided the vendor has notice of purchase.

5. **Same.** *Same. Injunction.* But if the purchase was made pending an injunction on the original vendee, the same is voidable at the instance of the party suing out the injunction, and against him the sub-purchaser has no such equity.

6. **Same.** *Notice of sub-purchase.* Registration of deed to sub-purchaser is not notice to vendor of the sub-purchaser's equity; but assertion of the same by pleading, or report thereof by the master, or recital thereof in decrees in a cause to which the vendor is a party, will be constructive notice to him.

7. **Same.** *Notes of sub-purchasers.* The holders of the purchase-money notes of such sub-purchasers by assignment from the original vendee are entitled to an equity equal to that of the sub-purchasers, and of the same general character.

Boyce *v.* Stanton.

8. TRUST. *Implied or constructive.* The promise of B., under such circumstances, that if the execution of the order of sale is delayed, and he allowed to sell his portion privately, the proceeds shall be applied to the payment of the vendor's lien and other incumbrances on the whole tract, and the consequent assent of all parties to the delay, and the sale by B. during such delay, constitute a trust-fund out of the proceeds of sale, for the satisfaction of the various encumbrances and the protection of sub-purchasers.

9. SAME. *Assignee of trust-fund.* Any person, and especially the vendor, who receives such fund with knowledge of the facts, giving it a trust character, is chargeable with it as trustee, or with so much of it as comes to his hands.

10. SAME. *Same. Claim of assignee in bankruptcy.* The character of the fund is not changed by the subsequent bankruptcy of B.; and his assignee has no claim upon or right in such trust fund.

11. CONSENT DECREE. *Character and effect of.* A consent decree is in the nature of a judicial contract between the parties consenting, and after its entry, is as conclusive upon parties as other contracts, and cannot be avoided by the subsequent protest or retraction of dissatisfied parties.

12. SAME. *Binding on whom.* Such decree is binding only on such parties to the cause as consent thereto, either in the terms of agreement or those of consequent adjudication, made in pursuance of the agreement, unless it clearly appear that the decree was rendered upon a hearing of the cause.

13. MISTAKE. Mistake as to the legal effect and consequences of an act is not ground for relief in equity.

14. SAME. *Registration. Parol proof.* A deed takes effect from the date it is noted for registration, and the date of such noting may be proven by parol, even to the correction of a mistake.

---

FROM HAMILTON.

---

Appeal from the Chancery Court at Chattanooga. W. M. BRADFORD, Ch.

J. B. HEISKELL and TOMLINSON FORT for Boyce.

J. B. & T. H. COOKE, and M. H. CLIFT for general attaching creditors.

J. A. CALDWELL, NASH H. BURT, and PHELAN & GOREE for mechanics and furnishers.

DEWITT & SHEPHERD, WHEELER & MARSHALL, and BARTON & SON for sub-purchasers.

W. L. EAKIN for Duffy.

INGERSOLL, Sp. J., delivered the opinion of the court.

The separate cases, almost a hundred in number, in these consolidated causes present, in numerous transcripts, containing many thousands of pages, a manifold and complicated controversy between a vendor and other creditors of an insolvent vendee, and sub-purchasers under him, and the holders of their purchase-money notes, over the titles to and proceeds of the sale of numerous lots in the city of Chattanooga, worth now fully a half million dollars, and all embraced in the boundaries of an original purchase by Stanton from Boyce in the year 1870. Various portions of this so-called Stanton litigation have been before this court, and been adjudicated, during the past twelve years; and in 1880 all the consolidated causes were here on appeal for decision.

The general determination of the court, then, is thus stated:

" While we are satisfied the decree of the chancellor is not based upon correct principles, and is not sustained by the record, yet we see enough to satisfy us the merits of the case cannot be attained upon the record as it is at present, and that further inquiry

must be made; and to that end additional pleadings and proof thereunder are necessary": 5 Lea, 432.

The chancellor's decree, which had declared Boyce's vendor's lien satisfied, and also held him to account to attaching creditors for funds of Stanton declared to be in his hands, was therefore, on Boyce's appeal, reversed, and the causes remanded, to the end that by proper pleadings, amended and supplemental, all the equities of the various parties in interest might be regularly presented for adjudication, and all necessary parties brought before the court, to the end that complete justice might be done in the premises.

Accordingly, after the remand, various bills, original, amended and supplemental, were filed by numerous parties, creditors, sub-purchasers and holders of their notes. Numerous petitions were also filed by sub-purchasers, and orders were made thereon. Many mechanics and furnishers, with decreed liens, are also permitted to become parties complainant to the creditors' bill filed by Crutchfield and others, and to set out in the order, on the minutes of court, as amendment to said bill, their several decrees for recoveries and liens; and the master was ordered to issue, and send out a copy of the same, with the *subpœna* to answer, as though the same had been embraced in an amended bill regularly filed. Many of these proceedings, and especially the last named, are here earnestly objected to because of their informality and irregularity; and the objections, if properly made *in limine*, would probably have been fatal. But where, as is the case in most instances, the defect is formal merely, and the parties

treated the matters as though they were before the chancellor for adjudication, we have ignored the irregularities and treated the matters' here just as the parties themselves treated them in the court below.

The facts of the case are set forth at length in the opinion of Judge Turney, reported in 5 Lea, 423, under the style of *Alabama* v. *Stanton*, and it is not therefore deemed necessary to repeat them in detail here. A brief outline must suffice:

In January, 1870, Dr. J. P. Boyce, as executor of Ker Boyce, deceased, sold and gave bond for title to J. C. Stanton for about sixty-nine and a half acres of land, then in the immediate suburbs of Chattanooga at the price of $2,000 per acre, mostly in deferred payments. Stanton immediately proceeded to lay it off into city lots, with streets and alleys, as a part of the city, setting apart about twenty-four acres for the use of the Alabama & Chattanooga Railroad Company, then in process of construction, on which he erected engine-house, depot, shops, etc. He also retained some five or six acres more, on which he erected the Stanton hotel, a livery stable, a post-office, and perhaps other buildings. The most of the remainder he sold in lots to various purchasers, to some giving deeds, to others title bonds; from some receiving cash and others notes, which he negotiated to divers parties. Many purchasers built houses upon their lots, and otherwise improved them.

In 1871, creditors of Stanton began filing bills to attach his interest in the entire purchase. These were soon followed by the bills of mechanics and furnish-

ers, asserting their statutory liens specifically upon the hotel property, livery stable, post-office, etc., wherever they had done work or furnished materials. Then came the bill of Boyce, as vendor, to assert his lien upon the whole premises sold to Stanton. In 1873 and 1874, after consolidation, decrees were pronounced declaring the rights, equities and priorities of the various parties, and directing sales for the satisfaction of the prior lien of the vendor, and the subsequent liens of the mechanics and general creditors, but suspending the execution of the order till the decision of a controversy between Boyce, Whitesides and Crutchfield over the purchase-money of the property. Then ensued a long delay, even after the decision of that case, during which Stanton was endeavoring to raise the money to pay off all the debts. To accomplish this, he sold the twenty-four acre railroad lot, once to the receivers of the Alabama & Chattanooga Railroad Company in 1873. But this sale was never completed, nor does it appear ever to have been entirely abandoned or rescinded. Afterward, in 1877, Stanton bought the railroad, and then negotiated both the railroad and lot to one John Swann. To secure the necessary delay he had promised the creditors that the proceeds of this lot should be applied to the payment of debts that were liens on his property. He received most of the purchase-money, and made payments on the vendor's lien, bought up some of the debts at half-price, and assigned a considerable balance to Boyce, not however as credit on the purchase-money debt, but for Boyce's own

personal benefit. Tax-sales and encumbrances also appear to increase the confusion and complications of this case, in which Stanton is the chief actor, and the proceeds of the sale of the twenty-four acre lot is the bone of contention. The common ground occupied by all the pleadings filed since the remand in behalf of sub-purchasers, assignees and creditors of Stanton, is that Boyce's purchase-money has been fully paid and his vendor's lien discharged, and this is the point in the case first in importance and in difficulty.

The sale was at $2,000 per acre, and it is insisted that, though the tract sold was supposed to contain sixty-nine and a half acres, it was agreed that the exact quantity should be ascertained by survey; and that a survey by Stanton several years after the purchase showed it to contain only about sixty-seven acres, and that the purchase-money should be therefore abated *pro tanto*. It appears, however, that a survey made about the time of the sale showed sixty-nine and a half acres, and for aught that appears it was as accurate as the later one. Besides the decree of May, 1874, based upon the purchase-money notes of Stanton, fixes the balance due at $122,501.90, and adjudges a recovery for that sum, and a sale of the property to enforce the vendor's lien. Stanton submitted to this adjudication; and in all subsequent proceedings it seems to have been acquiesced in and recognized by all parties as correct. We, therefore, regard it as conclusive of the amount of purchase-money then due. A report of the master, ordered at October term, 1877, and filed November 12, for

the purpose of showing what payments had been made on the vendor's lien, shows a balance due September 26, 1877, of $56,694.87. This is after deducting from the sum aforesaid of the decree of May, 1874, the payments of $18,372, in full of Crutchfield's interest, and $72,000 to Boyce made in September. This report on purchase-money was unexcepted to, and may be properly assumed as correct, though no express decree of confirmation appears in the record.

To determine whether this balance has been paid, or the lien of vendor discharged in any way, requires a review of the negotiations and transactions of Stanton with the receivers of the Alabama Railroad, with John Swan, the representative of English capitalists purchasing the road, and with Fred. Wolffe, his agent and broker, and with Boyce, and an examination of their effect upon the suits then pending, also the relation and duty of Boyce to Stanton's creditors and sub-purchasers, whether intentionally assumed or imposed by law. For the latter it is insisted, not only that Boyce's lien has been extinguished, but also that he is liable as trustee of Stanton's property, or as his surety, in a sufficient sum to satisfy the debts of all his creditors. Boyce denies that his dealings had any relation to the purchase-money due him, denies that the same has been paid, or that he has any thing in his hands for, or is in any way liable to, Stanton's creditors on account of said dealings.

On May 19, 1873, at the hearing of these consolidated causes, the chancellor pronounced a decree determining the rights and priorities of most of the

parties, and on May 23, 1874, in another decree affecting the same parties, with some others, the same adjudications are substantially repeated; and so far as they affect the questions now before the court, these decrees were submitted to by all parties in interest, and generally, if not universally, recognized by the parties as fixing their relative rights, equities and priorities, and frequently thereafter referred to and revived by subsequent orders till 1879. No reason appears why these decrees should not conclude the parties thereto, and we shall therefore treat them as a basis for the examination of subsequent transactions. These decrees declared the validity of Boyce's title and sale, the liability of Stanton, and the amount thereof, adjudging a recovery as aforesaid, and ordered a sale to enforce the lien of Boyce as vendor, and also the satisfaction of the claims of the attaching and lien creditors. The entire tract was held to be subject to the vendor's lien; but the decree contains the following specific directions and declarations as to the sale and the funds to be realized. There was to be sold: .

"First. All that portion not heretofore sold or contracted to sub-purchasers by respondent Stanton.

"Second. If that part or unsold portion should not be enough to pay said vendor's lien, then the lot or portion last sold by respondent Stanton shall be next sold, and such sale then continued in the reverse order of sale so made by respondent Stanton until the vendor's lien shall have been satisfied.

"Third. In relation to the prior equities or con-

flicting equities which may arise between sub-purchasers of lots or parcels of said sixty-nine and a half acres from respondent Stanton and mechanics and material men, the chancellor decrees that their equities will be determined according to priority of time; and if any such parties' rights or equities have to be sold or encroached upon in order to satisfy the vendor's lien hereinbefore declared, those will be last sold or taken that were first acquired, that is, the last acquired will be first subjected to the satisfaction of the vendor's lien, and in the reverse order of the time of acquiring their said equities until such residue of said vendor's lien shall have been satisfied.

" Fourth. As to general creditors of respondent Stanton, who have filed bills in these causes, attaching surplus, and had decrees rendered in their favor, but without specific liens, they will be paid out of any surplus that may remain from sales of said realty, after paying or satisfying the vendor's lien and specific liens in this decree declared, or that may exist under the principles of this decree; and such general creditors will be then paid out of such surplus in the order of time in which, they filed their bills and attached such surplus.

" Fifth. The chancellor is of opinion, and so decrees, in all cases of sales of lots or portions of said realty by respondent Stanton, after the filing of such attachment bills, such sales of such lots or portions or parcels of ground will be held subject to such attachments, and such attaching creditors have their election to have such lots or portions of ground sold.

for the payment of their debts, or the notes or proceeds
of sale for which respondent Stanton sold the same."

This decree established between Boyce and the other
creditors and the sub-purchasers the relation of senior
and junior lien-holders; and the duty of Boyce to-
ward the others would seem to be the same as that
of a first mortgagee with notice toward a subsequent
mortgagee, purchaser, or lienor.    He would, there-
after, have no right to release any portion of the
land to the injury of the latter.    If he should do
so without their consent, they might insist upon a
credit on the vendor's lien of a sum equal to the
value of the property released, or an abatement of
such proportion of his debt as the part released bore
to the whole in value :   *Jones* v. *Maney*, 7 Lea, 341;
Jones on Mortgages, sec. 722;   *Henshaw* v. *Wells*, 9
Hum., 566.

Whether this valuation should be made as of the date
of the first mortgage, or of the subsequent purchase or
encumbrance, or of the release, has not been uniformly
determined, the decisions varying according to the pe-
culiar facts of the cases, in some, the earliest, and in
others the latest date being fixed, so as to do equity
to all the parties in interest.    Equity demands good
faith ;  it seeks to preserve confidence and uphold
credit.    It does what it can to effectuate the reason-
able expectations of prudent men, and, in adjusting
the rights of contending parties, so proceeds as to re-
alize, if possible, to contracting parties that which
they had a right to anticipate when making their
contracts or investments or giving their credit.

In this case, Stanton began selling lots immediately after his purchase, and continued selling down to the time of the filing of the bill to enforce the vendor's lien. Some persons even purchased after the decree of sale. He began immediately also to improve a part for himself and for the terminal and shop facilities of the Alabama Railroad, then in process of construction, in which he was largely interested; by all which, as well as by the consequent and attendant growth of the city, the value of his purchase was very greatly enhanced. Shortly after the purchase he had paid $40,000 of the price, and there is no doubt that sub-purchasers took these facts into consideration, as they had a right to, when buying from Stanton. If the purchase money were entirely paid, then their purchases would be discharged from the vendor's lien, even though Boyce should delay the transfer of title. If it were only partially paid there would be a ratable abatement of the lien.

If Stanton should always hold enough in value of the property to satisfy the balance of unpaid purchase money, purchasers could buy from him with impunity, and pay him for their purchases.

If, therefore, on the day before the filing of the vendor's bill, Stanton sold a lot, retaining, however, portions of his purchase from Boyce, sufficient then, or at any time thereafter, to satisfy the vendor's lien, the purchaser from Stanton would be perfectly secure in his purchase, under the settled rule of equity expressed in the chancellor's decree aforesaid, viz: that among sub-purchasers the last shall be first and the

first shall be last liable for the satisfaction of the common lien upon their purchases, even though Stanton had subsequently sold all the rest of the tract. And if Boyce, with notice of said purchase, had released his lien on the part still held by Stanton on the day of said sale, either before or after Stanton sold it, that would have entirely discharged from his lien the lot bought as aforesaid on the day before filing the bill, and also all other previous purchases of which he had notice. Equity would not enquire what was the proportionate value of the part released to the entire property at the date of Boyce's sale to Stanton, nor consider that Stanton had, by his betterments, made one-tenth in value of his purchase worth nine-tenths of the whole, but would condemn the lots to sale in the reverse order of their alienation. The same rule would seem to apply to mechanics', attachment and mortgage liens, as to the equities of sub-purchasers. Because of the vast numbers of these and the difference of dates of acquiring liens by them, and especially of fixing the date of notice thereof upon Boyce, for convenience and equity the time for making such apportionment of value, in a case like the present, should be the date of the release; since if at the date of release, the property first liable, i. e., that still held by the original vendor, is worth the entire debt, the release of that part of the property should discharge all the rest.

It is insisted for Boyce, who did not convey, but only gave bond for title to Stanton, that "nothing short of satisfaction of the debt or express waiver

by deed will operate as a waiver of a vendor's lien;" and to sustain this comprehensive statement is cited Jones on Mortgages, sec. 232, in which is stated the familiar rules that the vendor's *lien,* not mere equity, is not waived by taking other security, nor by changing, substituting or renewing notes, nor by extending time or reducing notes to judgment. But in the same section the author says: "The vendor who has an *express lien* may, by his acts or declarations, waive it, as by inducing another to buy the property as unincumbered, or by permitting and encouraging the administrator of his vendee to sell the property to satisfy the lien and bidding at the sale." Neither of these would be a satisfaction of the debt or express waiver by deed; but either would as effectually waive the lien.

The Tennessee cases cited also to support the same view, have all been examined, and none of them contain an adjudication to support the proposition of counsel. The declaration of Chief Justice Catron in *Gillespie* v. *Bradford,* 7 Yer., 170: "Nor is a case recollected * * where the vendor was deprived of his legal title without having received his purchase-money," we do not think was intended in the broad, unlimited sense given it by counsel. Besides, it was employed in arguing the relative superiority of vendors' and mechanics' liens, and the only point therein adjudged was that the statutes of 1825 and 1829, giving mechanics liens for material and labor, did not prefer them to vendors still holding the legal title. It must, therefore, be treated as a mere *obiter dictum.*

Nor does it gain the force of law by being quoted and repeated by Judge Hawkins in *Fogg* v. *Rogers,* 2 Cold., 295, for there the only question was, whether a vendor by mere title-bond waived his lien by accepting a mortgage on other property as additional security.

The other cases relied on to sustain the contention, are *Graham* v. *McCampbell*, Meigs, 52; *Anthony* v. *Smith*, 9 Hum., 511; *Hinds* v. *Perkins*, 2 Heis., 401; *Cleveland* v. *Martin*, 2 Heis., 131; *Burson* v. *Dosser*, 1 Heis., 754, and *Mulherrin* v. *Hill*, 5 Heis., 59. All these concur in declaring the *status* of a vendor still holding the title to be, identical or of equal dignity with that of a mortgagee. This cannot be questioned. But the volumes of equity reports abound with cases in which mortgagees were decreed to have waived or released their liens from all or a part of the mortgaged premises without having received satisfaction or given written waiver or discharge to the debtor; and the text-writers concur in stating that this may be done: 2 Leading Cases in Equity, 271; Jones on Mortgages, secs. 722–32 and notes.

The sales ordered in 1873–4 were delayed for divers reasons and causes, chiefly on account of the urgent importunity of Stanton, and the hope of others that by negotiation and sale outside he might save all parties from loss, and possibly retain something for himself out of the property, until September, 1877, when the master, on the 17th, began enforcing the decree of sale. On that day he received from Boyce, in New York, the following telegram: "I

am expecting payment every hour of several thousand dollars for costs, taxes and vendor's lien upon Stanton addition. Postpone sale from day to day until further notice. Jas. P. Boyce, Executor." Sales of a large number of smaller lots, and some valuable ones, were slowly made from. day to day, leaving, however, the hotel and railroad property, the only parts still held by Stanton, yet unsold; and on the 22nd the counsel of Boyce, who was with him in New York, and who was evidently informed each day of the sales made, sent the master the following telegram : "Swann promises eighty-four thousand dollars to-day. If sale goes on will not get it. Boyce demands postponement till Tuesday. Answer quick. Tomlinson Fort."

The demand for delay was made for the purpose of enabling Boyce, Stanton and Swann to consummate their negotiations in New York in regard to the railroad property, and was acceded to by the master only after six-sevenths of the other creditors had expressed in writing their consent, and bonds of indemnity had been given him by Stanton and Crutchfield and Stanton and Boyce. The full significance of these telegrams and the consequent delay can be seen better after a brief summary of Stanton's railroad operations.

Before the purchase from Boyce, he had been interested in and acting for the Alabama & Chattanooga Railroad Company, and immediately after the purchase he laid off about twenty-four acres of the sixty-nine and a half for the use of the railroad, and erected thereon a depot, shops, etc., using the money of the

·company therefor. For this, doubtless, and perhaps for other things, the company was his creditor, and probably had a lien upon or equity in this twenty-four-acre tract. The company may also have been his debtor for services, etc., and the account between them very difficult of accurate computation and adjustment. For Boyce it is insisted that these old accounts must be considered in ascertaining the relation of the parties . and determining the extent of interest held by Stanton in this property. This is not feasible nor necessary. The railroad had become bankrupt, and been so adjudicated in the Federal Court at Montgomery, Alabama. It was placed in the hands of receivers ·of the Federal Court at Mobile at the foreclosure suit of the first mortgage bondholders; and not only had the accounts been matter ·of adjudication in the bankrupt suit, but the receivers of the road had, by authority of the court, purchased these twenty-four acres from Stanton at $240,000, thus recognizing his ownership as against the company. Besides, at the sale of the road, its rights, credits, franchises, etc., under decree of the Federal Court at Mobile, on January 22, 1877, in the foreclosure suit, Stanton had become the purchaser thereof, and if any right, claim or interest remained in the company on this land, or against Stanton, or in his favor against the company, there was a merger by this transaction; and the former equitable interest of the company in this land was absorbed by Stanton; the same must, therefore, be treated as his property, according to his purchase from Boyce, as it was so regarded by all

the parties in their proceedings and dealings in regard to it: Pom. Eq. Jur., secs. 789–90.

In September, 1876, before Stanton had bought the railroad, the master, on the eve of sale, had been stopped by order of the chancellor on Stanton's petition and the almost unanimous consent of the creditors, other than Boyce, who kept silent—they seeming to agree that, as to all of them, a forced sale would be a ruinous sacrifice of the property, and profit only the vendor with the prior lien.    Boyce's peremptory demand for delay a year later, when, so far as the record then showed or the other parties knew, his lien was as good as ever, may be accounted for on the events following Stanton's purchase of the railroad by his agents, Wilder & McMillin, which are recited in the documents of which the following is the substance:

Whereas, At a sale of the Alabama & Chattanooga Railroad and property and appurtenances, made on the 22d of January, 1877, by commissioners appointed by the Circuit Court of the United States at Mobile, under the decree of said court, John T. Wilder and D. C. McMillin became the purchasers of the same at and for the price of $600,000, Stanton agrees and binds himself to Swann, that he shall be substituted as the purchaser of the said railroad and other property in the stead and place of the said Wilder and McMillin, and that the said court shall confirm such substitution and vest in Swann the title and interest in said railroad and other property, on his complying with the terms of said sale; and that he, Stanton, will, on delivery to him of the bonds hereinafter mentioned, make or cause to be made and delivered to Swann, good and legal titles in fee simple of the said 24 4-15 acres

of land; and that he will, on the delivery of said bonds, deliver to Swann all the receiver's certificates that were received from them by him on account of the sale by him of said lots to said receivers, which have not been accounted for by him to the said court; and that he will, and does hereby release, all claims and demands held by him against said company or its property.

And the said Swann hereby agrees and binds himself to pay to Stanton eighty thousand dollars in cash, sixty thousand dollars in twenty days, sixty thousand dollars in sixty days, and fifty thousand dollars in ninety days, all from this date; and that he will organize and form a new company and corporation within ninety days from this date; and that said new company shall issue and deliver to the party of the first part, within ninety days from this date, its bonds to the amount of four hundred and thirty thousand dollars, payable thirty years from their date, with interest coupons attached at six per cent. per annum, also payable semi-annually, which bonds and coupons shall be secured by a first mortgage on the said railroad and other property owned by said new company. Executed in duplicate, this 31st day of March, in the year of our Lord 1877.

J. C. STANTON,
JOHN SWANN.

The said parties, for the same consideration expressed in the said original contract, mutually agreed as follows, in modification and change and addition to the said original contract:

1. Said John C. Stanton agrees to receive from said John Swann in payment of balance due and unpaid under said original contract, two hundred and eighty-five thousand ($285,000.00) dollars in the kind of bonds mentioned in the original contract, in full payment and satisfaction of all claims and demands remaining unpaid against the trust

fund in the Alabama & Chattanooga case, mentioned in said original contract, and to retire the evidences of said claims and demands, and to deliver the same to the said John Swann, on receipt of said two hundred and eighty-five thousand dollars in bonds, the said payment of bonds and delivery of evidences of claims and demands to be made as soon as practicable within sixty days after the date hereof, and when said J. C. Stanton makes title to the lands in Chattanooga mentioned in said original contract.

Witness our hands, this 19th of June, 1877.

J. C. STANTON,
JOHN SWANN.

And again:

First. The said John C. Stanton agrees to release and does release the said John Swann from performance of the last contract in writing between said parties, dated June 19, 1877, to the extent of eighty-five thousand dollars of bonds, and to accept two hundred thousand dollars of said bonds mentioned in the last named contract in full satisfaction of what is due to him under and by virtue of the two contracts subsisting between said parties; and the said John C. Stanton further agrees to deliver to said John Swann a good and perfect title to the land at Chattanooga, Tennessee, on which the depot buildings of the Alabama & Chattanooga Railroad stand, the same land that was purchased by the receivers in the case of D. N. Stanton and others against the Alabama and Chattanooga Railroad Company and others, and mentioned in the two said contracts: and said J. C. Stanton acknowledges that, on receipt of said two hundred thousand dollars of bonds, he will be fully paid for said land and for all his claims of every kind and description against the trust fund in said cause, and said John C. Stanton hereby pledges to said John Swann the said two hundred thousand dollars of bonds; and the said John C. Stanton further agrees that, on receipt of the loan money to be made him by said John

Swann, as hereinafter provided, he will deliver to said Swann all receiver's certificates received by him for said land, and for which he has not accounted to the court.

Second. In consideration of said agreement of said J. C. Stanton, said John Swann agrees to deliver to said John C. Stanton, within ninety days ·from the date hereof, two hundred thousand dollars of the kind of bonds mentioned in the two subsisting agreements aforesaid between said parties, subject to all the provisions of this contract; and said John Swann further agrees to loan on the pledge of said two hundred thousand dollars of bonds, which said bonds are to be deposited with Plock & Co., No. 51 William street, New York, the sum of one hundred thousand dollars in cash for the period of four months from date, without interest, said Swann to have power to sell, at public or private sale, said bonds for his reimbursement, in case of default in the payment of said loan at or after the expiration of said four months, said sale to be with or without notice; said loan of money is to be made on the 22nd instant, before eleven o'clock, A. M. Six hundred thousand dollars of said bonds shall be kept and reserved by Plock & Co., for the purpose of discharging the balance of said court liens, and only for such purpose; all over and above said six hundred thousand dollars of bonds may be disposed of as said John Swann may see fit. In witness whereof said parties hereto set their hands, this 21st day of September, 1877.

J. C. STANTON,<br>JOHN SWANN.

One week before the execution of this last modification of contract, and in pursuance of the request of Stanton, and with consent of Crutchfield, given ten days before, Boyce made a deed to Swann, of which the following are the material parts:

Whereas, heretofore, to-wit: on the 11th day of Jan-

uary, A. D. 1870, I, James P. Boyce, as the executor of the estate of Ker Boyce, deceased, made and executed a title bond to John C. Stanton, for a certain piece or parcel of land, described in said bond;

And Wm. Crutchfield admitting that John Swann has paid to him for and on account of the said John C. Stanton the sum of twenty thousand dollars, which he (the said Wm. Crutchfield) has accepted as a payment *pro tanto* upon the one-eighth of the proceeds of the sale made to said Stanton, as aforesaid, and which payment is a credit to said Stanton upon his purchase aforesaid;

And the said John Swann having paid to me for and on account of said Stanton the sum of twenty-five thousand dollars ($25,000), which I accept as a credit to the said John C. Stanton upon his purchase aforesaid;

And the said John C. Stanton having directed and requested me in writing under his seal, and the said William Crutchfield having consented thereto and concurred therein, I do hereby, for myself and as executor aforesaid, in pursuance of said request and consent, transfer and convey unto John Swann, of London, England, a piece or parcel of said land containing twenty-four and four-fifteenths (24 4-15) acres, upon which the machine shops, round house, depots, new passenger sheds and tracks of the Alabama & Chattanooga Railroad Company in the city of Chattanooga, Tennessee, are situated, sold by the said John C. Stanton to the receivers of said railroad company under various orders, reports and decrees had in the Circuit Court of the United States for the fifth judicial district of the United States and southern district of Alabama, at Mobile, Alabama, in the cause of D. N. Stanton and others, trustees, etc., against the Alabama & Chattanooga Railroad Company and others, and being a portion of the land sold by me to the said John C. Stanton;

To have and to hold unto the said John Swann, his heirs and assigns, in fee simple forever.

And I do covenant with the said John Swann, his heirs and assigns, in my capacity as executor of the last will and testament of Ker Boyce, deceased, that I am lawfully seized of said land, and that I have a good right to convey the same; that I will warrant and forever defend the title to the same against all persons claiming through or under me, or under the will of my testator, Ker Boyce, deceased; but I do not warrant the title to said land against any claims of any kind or nature whatever, that may have arisen from taxes of any kind that may have been assessed against said land since my sale to said Stanton, on the 11th day of January, A. D. 1870, nor do I warrant against any claim or lien that may have been fixed upon the equitable interest of said John C. Stanton in the said twenty-four and four-fifteenths acres of land herein conveyed by me since my sale to said Stanton; and I do hereby expressly retain, and do not release, my lien as vendor upon the remainder of said land sold by me to said Stanton; but said twenty-four and four-fifteenths acres is not discharged and free from any lien I may have had as vendor.

And it is further expressly agreed between and among the several parties to this deed, and all others who have assented, or may assent thereto, that if, at any time, or for any cause, this deed shall be ascertained or adjudged to be or to have become inoperative, in whole or in part, to protect the said grantee, John Swann, in the undisturbed enjoyment of the title or possession of the property hereinbefore conveyed to him, then, and in any such event, the said John Swann, or those claiming under or through him, shall be deemed and treated in all respects as the assignee or assignees of the vendor's lien on the land hereby conveyed, now owned by said J. P. Boyce, executor, as aforesaid, William Crutchfield and Harriet L. Gaskill, executrix of James A. Whiteside, deceased, and of the decree declaring and establishing those liens rendered by the chancery court of Hamilton county, at Chattanooga, Tennessee, in the

causes in that court, which were consolidated and known by the name and title of The State of Alabama against the Alabama & Chattanooga Railroad Company and others, to the amount and extent of the several sums which the said Boyce and Crutchfield have received out of the means and funds furnished or advanced by said John Swann to obtain this deed, and as is hereinbefore set forth. And the said John Swann shall in any such event as that above mentioned, be entitled to enforce said lien or decree *pro tanto*, precisely as said Boyce and Crutchfield could have enforced the same at or before the execution of this deed ; and every part of the funds or money received by said Boyce and Crutchfield, as above mentioned and shown, as any part of the inducement to execute this deed, is received subject to this agreement and upon the distinct understanding that it is not received as a discharge of said lien or of said decree to any extent, unless this deed proves to be and continually operates as a complete investiture of the said John Swann with a perfect title to the lands hereinbefore conveyed to him, and with the undisturbed enjoyment of the same. But this agreement is not to be in any manner construed so as to make said twenty-four and four-fifteenths acres liable for any sum or sums of money the said John Swann may have heretofore paid the said John C. Stanton.

This, the 14th day of September, A. D. one thousand eight hundred and seventy-seven.

JAMES P. BOYCE, [*Seal.*]
*Executor of the estate of Ker Boyce, deceased.*

The order of events will show the relation of the parties and their means of knowledge in regard to these September transactions.

On the 4th Stanton made his request and Whitesides gave his consent, that Boyce execute the deed for the railroad property to Swann.

On the 14th Boyce executed the deed.

On the 17th, the day when the master began his sales, Boyce sent the telegram requesting postponement from day to day; but the sale proceeded slowly until the 22d.

On the 21st was made the last modification of the contract between Stanton and Swann.

On the 22d the "demand" telegram was sent by Fort for Boyce, and the master accordingly adjourned sales until the 25th.

On the 24th, the deed from Boyce to Swann for the twenty-four-acre tract, was placed of record in the register's office at Chattanooga.

On the 25th the master again postponed sales, so as not to reach the hotel and railroad property, until the 26th.

On the 26th, nearly all the creditors having signified their consent in writing that the further sale, *i. e.,* the sale of the property last aforesaid, be deferred till after the next term, and the master being informed of the payment by Stanton of from eighty to one hundred thousand dollars on vendor's lien, the further sale was postponed, and so reported.

On the 28th, closely following these transactions, Boyce and Stanton make a contract containing extraordinary and peculiar stipulations not requiring notice, by which Stanton assigns to Boyce his interest under his contracts aforesaid with Swann; and they mutually covenant and agree that the transfer shall be void upon the following conditions. That is to say:

1st. If the said Stanton shall indemnify and save harmless the said Boyce from any liability to any person or per-

sons by reason of the execution and delivery of the deed to John Swann for the twenty-four and four-fifteenths acres of land, and shall pay and satisfy any judgment or decree which may be recovered in law or equity against the said Boyce, either in his own right or as executor of Ker Boyce, deceased, by reason of the execution and delivery of said deed to said Swann, and of the covenants contained therein.

2nd. If the said Stanton shall indemnify and hold harmless the said Boyce for any loss or damage, and shall pay and satisfy any judgment or decree which shall be rendered against the said Boyce, by reason of the execution and delivery to T. M. McConnell, clerk and master of the said chancery court of Chattanooga, of the bond of indemnity bearing date of September 26th, 1877.

3d. If said Stanton shall pay and satisfy two promissory notes, and shall pay to Boyce interest at the rate of eight per cent. per annum, instead of at the rate of six per cent. per annum, upon the aforesaid, two notes for ten thousand dollars and fifteen hundred and twelve dollars and fifty-seven cents.

4th. If the said Stanton shall pay to the said J. P. McMillin two and one-half per cent. upon the purchase money of the said Stanton's addition in the city of Chattanooga, sold on or about January 10, 1870, as aforesaid, with interest thereon from that date.

5th. If the said Stanton shall pay and satisfy all such claims, or judgments and decrees, of any court of competent jurisdiction against him for which he may be legally liable, and shall pay and satisfy any and all other claims, demands and equities to which the said Boyce may, in any manner, become entitled in law or in equity, and which may be lawfully due by the said Stanton, or which may be acquired, or in any manner obtained lawfully by the said Boyce any time before the final winding up and settlement of all the covenants, contracts and agreements contained

in this instrument; provided, and it is hereby expressly
agreed that any surplus of money or property which may
remain in the hands of the said Boyce, or to which he may
become entitled by reason of the covenants, contracts and
agreements contained in this instrument, and also contained
in the said transfer by the said Stanton, bearing date this
day of the contract of the said John Swann and himself,
after the full compliance with all the aforesaid covenants,
contracts and agreements contained in this instrument, to
be done and performed by the said Stanton, shall be paid
to him, his executors, administrators, heirs and assigns.

In testimony hereof we have hereunto set our hands
and affixed our seals, this the day and year first above
written.

> J. C. STANTON, [*Seal.*]
> JAS. P. BOYCE, [*Seal.*]

The depositions of both Boyce and Stanton were
taken after this contract, on a reference to ascertain
what amount had been paid on the vendor's lien, and
in answer to inquiries upon that subject propounded
by the master, neither of them make reference to
this contract as a payment absolute or conditioned upon
the purchase price, or as affording any means of pay-
ment, certain or contingent thereon. It was at this
time that the master's report was made of a balance
of about $56,000 of purchase-money above referred to.
The order of sale was revived in November, and a
few lots of Stanton's sold, when, by consent of the
creditors, another postponement was made before the
hotel and railroad property was reached.

. At the April term ensuing were entered two con-
sent decrees in the causes, the first of which does not
demand special attention; the second is as follows:

With a view to compromise and diminish the chances and prospects of litigation in so far as possible in relation to the property attached, and, on which liens have been decreed in said causes, etc., all parties in these causes, who have either liens or decrees, appear in person or by their respective attorneys or solicitors, and admit that the twenty-four and four-fifteenths acres of land in the city of Chattanooga, Tennessee, upon which are situated the depots, tracks, shops and other improvements of the Alabama & Chattanooga Railroad Company, and which was conveyed by John C. Stanton and J. P. Boyce, executor, etc., respectively to John Swann, September, 1877, has out of the fund arising from the sale of said twenty-four and four-fifteenths acres to John Swann, contributed and paid its full portion of the liens upon the sixty-nine and a half acres of land sold by the said Boyce, executor, etc., to J. C. Stanton, of which said twenty-four and four-fifteenth acres is a part, and the said twenty-four and four-fifteenths acres should in equity be discharged from all liens thereon under proceedings in these causes—except the lien for taxes due thereon.

It is therefore decreed by agreement of parties aforesaid, that all liens existing on said twenty-four and four-fifteenths acres—except the lien thereon for taxes, are released and removed therefrom, but this release is in no wise to affect, alter or diminish the liens, rights or priorities of the parties under the decree heretofore rendered in these causes as to the remainder of said sixty-nine and a half acres, or any other property upon which they have liens.

But the same shall be and remain upon all property as fully, completely, and to the same extent, and with the same priorities and rights as heretofore decreed. But no rights or equity existing heretofore between parties of this suit or litigation shall in any manner be abridged or disturbed by this agreed decree. But each shall have all the rights, equities and remedies against the others touching

the collection of their decrees or enforcing their rights and equities in relation to each other, and against each other as to all the other part of the said sixty-nine and a half acres of land not covered by the said twenty-four and four-fifteenths acres, that they ever had. The only thing they release is the decreed liens and the liens fixed by attachments on the said twenty-four and four-fifteenths acres itself. And this release is not to have any reference to the proceeds of the sale of the same, or the rights of any one thereto, or the liability of any one therefor.

And nothing in this agreement and decree is to be so construed as to waive any lien of the State and county, or the mayor and aldermen of the city of Chattanooga for taxes assessed on any part or upon the whole of said twenty-four and four-fifteenths acres, nor demand upon the rightful party or parties to pay such taxes as remain unpaid. Nor is the same to be construed so as to prevent any one from contesting the legality or excessiveness of the levy of such taxes or the right to have each lot or piece pay its own tax.

It is further decreed by the court that in making the sale heretofore ordered of the unsold lands, the master will not sell the said twenty-four and four-fifteenths acres, except for the taxes due on the same, and the parties have four months from the date thereof to pay the taxes due on said twenty-four and four-fifteenths acres to the parties entitled, or into the office of the master for them, and if paid into the office the master shall pay the same out to the parties entitled thereto.

The claim of J. R. Taylor is not embraced or affected by this decree. Nor is the claim of S. B. Moe to be affected by or included in this decree.

On April 20, three days later, *the sub-purchasers and holders of their notes* appeared and procured to be entered of record, "that they did not, and do not

consent to said decree, but protest and except to the same."

J. A. Caldwell, former clerk and master, also excepted to the decree.

The entry also contains, on behalf of one who had been decreed a part of the purchase-money, and had joined in the deed to Swann, and was also a large creditor, the following: "And W. Crutchfield also excepts to said decrees so far as the same may in any way affect his rights and priorities as heretofore decreed in his favor in the · consolidated causes."

On the same day the court adjourned. Nine days later, on April 29, when the closing day's minutes were being read for approval and signature, Boyce, by his solicitor, appeared and sought to have also entered an order withdrawing his consent to said decrees as to all parties who did not give their consent, and giving notice that as to them he would insist on all his previous rights. This the chancellor properly refused, since court was not in session; thereupon Boyce filed his bill of exceptions thereto.

Obviously these protests and exceptions did not in any way affect the validity of the decrees. The record imports absolute verity, and the parties may not contradict its recitals. It recites that certain parties appeared and admitted certain facts, and therefore, by agreement of parties, certain things are decreed; that is, the parties described make an agreement in open court, not only as to what the facts are, but also what are the legal consequences. It is a written judicial contract, duly acknowledged and

executed, and conclusive upon the parties. It may be impeached and rescinded for fraud in its procurement; but otherwise it must stand. The parties may not appeal from it, or otherwise correct its errors. They may not recede from it, or withdraw their consent to it. Of course protest and exception avail them nothing (*Dillard* v. *Harris*, 2 Tenn. Ch., 196.), except as mere notice of the dissatisfaction of the parties so protesting and excepting. The amended and supplemental bills and proof show no sufficient reason for setting aside these decrees, and by them, therefore, the rights of the parties thereto must be determined.

The decree of April 15 merely contains the admissions of certain parties named that their debts have been satisfied, and of others that they have waived and released their liens and claims upon the twenty-four acre tract, and an adjudication accordingly, with an express reservation of all other rights and liens they may have in the cases on other property; and it does not affect the vendor's lien.

By the decree of April 17, "all parties in these causes *who have either liens or decrees,*" admit that the twenty-four acre tract "has contributed and paid its full portion of the liens" on the entire tract, "and should in equity be discharged from all liens, except the lien for taxes," and it was accordingly so decreed, expressly reserving the liens on all other property in the causes. It is first to be noticed that this is not a consent decree as to all parties, but only all "who have either liens and decrees;" and the

Boyce v. Stanton.

decree recites: "The only thing they release is the decreed liens and the liens fixed by attachment on the twenty-four and four-fifteenths acres itself." Taylor and Moe only are excepted.

Neither the sub-purchasers nor their note-holders had "either liens or decrees," and so could not release "decreed liens or liens fixed by attachment." They are not, therefore, parties to the decree, nor to be regarded as consenting to the release, (*Dillard* v. *Harris, supra; Penniman* v. *Smith*, 5 Lea, 136), and all parties interested were so expressly notified by their protest, if the terms of the consent decree were not themselves sufficiently explicit, though to us they certainly appear so. By this decree Boyce released his vendor's lien from the twenty-four acre tract. What effect did this have on the rights of the sub-purchasers and their note-holders? For Boyce it is strenuously urged that Stanton had dedicated this tract to railroad purposes, had used the railroad money in improving it, and the railroad company were in open possession before the other purchases, and so had an equitable right joined with occupation; and therefore, though he had never actually sold or conveyed it to the company, this tract was liable under the decree of sale only after all the lots of sub-purchasers, and therefore they are not affected by the release. This is ingenious; and if the railroad company were here asserting this right, it might prevail upon the grounds stated, if other conspicuous facts were ignored. But the company makes no such claim: the old company (the Alabama & Chattanooga) appears here bankrupt,

and probably entirely defunct; Stanton had bought its property and rights, and thus merged the claim; and besides, all the parties interested in the sale, Boyce included, up to the time of the sale and release, treated this as the property of Stanton, and hence liable before that of his sub-purchasers. They have, therefore, the right to demand that the value of this property so released by him, be, as to them, credited upon his vendor's lien decree. Boyce claims that this credit should be for only $48,000, the amount for which he sold it to Stanton in the general purchase at $2,000 per acre, and thus the recognized value at that date; and for this he relies on the opinion of Chancellor Kent in *Stevens* v. *Cooper*, 1 Johns. Ch. R., 425, in which such a principle was recognized and followed upon the doctrine of contribution among the various purchasers from a mortgagor after the mortgagee had released a part of them. We doubt if this doctrine of contribution would find recognition in our equity jurisprudence in cases of this character, except in case of contemporaneous purchasers from the vendee or mortgagor. Certainly it does not apply to the present case, where the contention is in effect between the first vendee and his sub-purchasers. With us equity requires the exhaustion first of all the land unsold in the hands of the first vendee before resorting to that of the sub-purchasers. And the value of that released is the measure of the credit on the purchase-money which the sub-purchaser may demand as against them in a case like this.

It is important, therefore, to correctly fix the value of

the twenty-four-acre tract sold by Stanton, and conveyed by Boyce to Swann at the date of the deed; and we cannot but regret the absence of clear and specific proof upon the subject, and the necessity of resorting to inference. The decision of the case, however, requires this value to be declared, and we must estimate it upon such evidence the parties have been content to offer.

It appears that Stanton sold the tract in 1873 to the receivers of the Alabama & Chattanooga Railroad Company, with the approval of the court at the price of $240,000. In 1874 and 1875, during the financial depression consequent upon the panic of 1873, the property was assessed for taxes at $125,000, which valuation the chancellor, without declaring. what was the worth of the property, held was so low that even the tax-payers had no ground of complaint. In 1879, certain mechanics in a petition insist that it could have been sold for at least that sum at any time on forced sale, as we understand. The separate price is not expressed in the contract between Stanton and Swann, the whole sum to be paid to Stanton for this property and the railroad together being $250,000 in cash and $430,000 in bonds. Allowing $80,000 to reimburse Stanton for his cash payment on the railroad, and there remains $600,000 for purchase-money to Stanton for both. There is a conspicuous absence in the testimony of Swann and Stanton of the ratio in which this was apportioned between the two properties; and counsel for Boyce say it is preposterous to assume that $240,000 of it was for the

twenty-four acres with the depot, round-house, machine-shops, etc., and only $360,000 for a railroad three hundred miles long. And so, perhaps, it would be. But that is not the price of the railroad. Stanton only sold to Swann his bid on the road, Swann assuming his liabilities for unpaid purchase-money, and Stanton agreeing to discharge certain liens and incumbrances in favor of his brother, D. N. Stanton, and others, the amount of which is not stated. The $600,000 thus represents the purchase-money of the twenty-four-acre lot and buildings, and a *bonus* to Stanton for his railroad bid, and the liens of his friends thereon. Boyce, Stanton and Swann seem to prefer to withhold the estimate of the value of the lot in the purchase, by saying, merely, that it and the railroad were estimated together, and sold in mass for a gross price. Since the parties interested to show that the purchase price of this lot, or its fair value at the date of sale to Swann, was less than the sum which the receivers were authorized and agreed to pay Stanton for it in 1873, or that it has decreased in value, or was any less necessary to the railroad when Swann bought than before, and since the purchase by him was for the same use as that by the receivers, we feel warranted in the inference that the price of it to Swann was not less than to the receivers, and therefore appraise it at $240,000, which was enough to satisfy, together with Stanton's other unsold property, the lien of the vendor and other attaching creditors, after paying costs and taxes.

We hold, therefore, that the lots of those sub-

purchasers, who were parties as such to the consoli-
dated causes at the time of the consent decree
aforesaid, or of whose purchases notice had been taken
by report, order or decree in the cause before that
time, are, by Boyce's release of said twenty-four acre
lot, discharged from the lien of Boyce as vendor, and
as to them his lien is satisfied.

As between the vendor and .the attaching creditors
and mechanics and others, who had liens on the prop-
erty subordinate to the vendors, the same reasoning
does not apply for the reason that they all consented
to the release of the twenty-four-acre tract. Their
rights, therefore, must be determined on other grounds.

As we have seen, in virtue of the decrees of
1873 and 1874, they and Boyce stood in the relation
of second and first mortgagees to each other. Thus
standing, both parties agree in admitting that the
twenty-four-acre tract "has, out of the *fund arising from
the sale to John Swann*, contributed and paid its full
portion of the liens" upon the entire tract.

At the date of this decree there had been paid
upon the liens out of this fund the following sums:

| | |
|---|---:|
| To Crutchfield on vendor's lien | $18,372 |
| To Boyce on vendor's lien | 72,000 |
| To Montague & Champion for taxes | 18,916 |
| To Sundquist and other attaching creditors, say | 40,000 |
| Making a total of about | $150,000 |

The admission was probably made upon the idea
that all the liens were to be apportioned upon all the
lots; this, however, was not only unwarranted by
our doctrines of equity, but was directly in the face

of the decree of 1874, adjudicating the primary liability of the lots unsold by Stanton, of which this twenty-four-acre lot was one. They thus released property worth about $240,000 on the payment by it of about $150,00, providing between themsleves, however, in the decree as follows: "But no rights or equity existing heretofore between parties to this suit or litigation shall in any manner be abridged or disturbed by this agreed decree. * * * The only thing they release is the decreed liens and the liens fixed by attachment on the twenty-four and four-fifteenths acres itself. And this release is not to have any reference to the proceeds of the sale of the same, or the rights of any one thereto, or the liability of any one therefor."

The obvious intention of the parties here is to confer upon Swann an encumbered title, but not to disturb the relations existing between themselves under their respective liens by decree. Boyce was at this time the assignee for Stanton of the unpaid balance of purchase money; and he now insists that the parties were dealing at arm's length, and he had the right, after the release, to apply this purchase-money as his own to any use he chose; while for the other creditors it is contended that he occupied a trust relation toward them, and so could not deal with the fund to his own private advantage, but must apply the same to the satisfaction of the debts of the creditors in the order of their priority.

At the time of the assignment of this balance of purchase-money to Boyce, the relation he held as first

mortgagee had not been at all affected by releases or agreements of release. Stanton's insolvency, or at least his inability to discharge these debts otherwise than out of the proceeds of this sale, was known to all. On this account, and to give him opportunity to raise the money for this purpose, the sale had been so long delayed. True, it was more to the advantage of others than of Boyce. Yet so deep was his interest in it that he had by telegram *demanded* the postponement. The parties to the suit had been assured by Stanton that the purchase-money of this lot would pay all his debts, and they expected their pay out of it. Boyce, as a party to the suit, permitting all these delays, could not, with his resident solicitor, have remained in ignorance of this. As a prudent executor, watching the interests of the legatees, as well as his own, and guarding against laches, he must have known of the delay, and of the causes of it. He denies having seen Stanton's petitions for delay filed in the cause or known of their contents; and we accept the denial as true. But that is not a denial of his knowledge of the facts on which Stanton asked, and his creditors, including Boyce himself, granted delay, and the purpose for which it was granted. It was the understanding among all parties that this fund, when realized, was to be applied to the discharge of Stanton's debts; and it was the duty of any party into whose hands it came, therefore, to so apply it. Stanton himself should have so used it. He had expressly promised to so apply it. Nor had Boyce

a right to receive it for other purposes. The mutual understanding of all parties had stamped upon it the character of a trust: Perry on Trusts, secs. 112, 166; and the party taking it in custody, with notice, became *ipso facto* a trustee : *Id.*, sec. 217. For whatever purpose Boyce took the assignment, the fund became in his hands primarily a security for the payment of his debt, and he was bound in equity and good faith so to apply it: Jones on Mort., sec. 728. And the right of the junior creditors could not be defeated by any arrangement between Stanton and Boyce : *Id.*, sec. 732.

But Boyce, as successor of Stanton in this implied or constructive trust, cannot be charged with Stanton's malversations, if there were any. We need not, therefore, inquire whether Stanton used all the money he received of this fund in paying liens, or converted some of it to other uses. Boyce was not his surety for faithful performance, and is only liable for so much of the funds as came to his own hands. What he received was $200,000 in bonds on deposit with Plock & Co., brokers, subject to certain demands against it for various liabilities of Stanton, referred to in the last contract between Swann and Stanton. The first was a loan of $100,000 by Swann to Stanton made on pledge of these bonds. This was repaid by an actual sale in open market of one hundred and fifteen bonds for the purpose. Boyce cannot therefore be charged with these. Of the remaining eighty-five bonds, twenty-three were claimed and retained by Swann to indemnify him against twenty-

three receivers' certificates of $1,000 each, which, with others, Stanton had received from Rice & Haralson, receivers of the Alabama & Chattanooga Railroad, on his sale to them, in 1873, of this twenty-four-acre tract for the use of the railroad; and these had not been accounted for as required.

The contract between Swann and Stanton contains a promise on Stanton's part to deliver to Swann all these certificates on receipt of the loan money. These twenty-three were not so delivered then, nor up to the date of final settlement. The contract expresses that the delivery of the two hundred bonds was "subject to all the provisions of this contract." This may fairly be held to include the promised return of the twenty-three receivers' certificates aforesaid; and in the condition of this record, we do not feel warranted in saying that it was improper for Boyce to permit the retention of an equal number of the bonds of equal face value for their redemption.

In the contract Stanton also agrees to deliver to Swann a good and perfect title to the twenty-four-acre lot. To accomplish this required that the liens in these causes be removed from it. In this way thirty-four bonds were used to reimburse Wolfle for sums expended at the request of Stanton and Boyce in buying up liens of Sundquist and others, parties to these suits. This, too, seems a proper use of these bonds in accordance with the requirement of the purchaser, and Boyce cannot therefore be charged with these, especially not since they were so applied before the fund came to Boyce's hands. This left

25—VOL. 15.

twenty-eight bonds, which, on the settlement between Swann and Boyce, September 5, 1878, were delivered to Boyce, but on condition that he should discharge all liens for taxes, and also remove from the record the objections filed by Moe and himself, and also protect Swann against the claims of Watkins and Taylor, or return said bonds to Swann. Fourteen of the bonds were thus employed, leaving fourteen free from any claim of Swann in Boyce's hands. But the amount of the proceeds of these bonds paid by Boyce to protect and indemnify Swann against the claim of R. L. Watkins or Watkins & Co., whatever it may have been, should not be credited to Boyce unless it was paid on decree or judgment against him or Swann, as it appears from their bill that neither Watkins or Watkins & Co. had any "claim in respect to said twenty-four and four-fifteenths acres," their bill having been filed after the deeds to Swann and the assignment of the fund to Boyce. Neither does the fund seem to have been charged with the debt of $1,700 paid R. Inge Smith.

These bonds it was his duty to apply to his purchase-money debt at their market value at the date they came to his hands, viz: 87 per cent. on September 5, 1878. To this should be added interest as accrued upon the bonds from the date of the assignment to Boyce till the settlement aforesaid between him and Swann, as was received by him. From the amount of Wolffe's claim, $31,600.78, and the fact that thirty-four bonds at 87 cents reimbursed him, we infer that the accrued interest in coupons

was transferred to Wolffe with the bonds, else he would have failed by about $2,000 of making himelf whole. In such case Boyce would not be chargeable with interest. But when he received it, and appropriated it to his own use, it must be credited upon his debt. In short, Boyce must credit upon his purchase-money debt the net amount of all funds received by him out of the proceeds of the sale to Swann, after discharging the incumbrances on the fund which Swann had stipulated for in the last contract between him and Stanton. This is the full meaning of the equitable demand against him in favor of Stanton and his subordinate creditors.

The suggestion of the bankruptcy of Stanton occurring in August, 1878, made in behalf of Boyce as an objection to this decree, is no obstacle to this appropriation of the fund. The assignee in bankruptcy has not appealed, and is not here complaining of such an appropriation. If he is content, surely Boyce may be and must be. Moreover, it is apparent that the assignee has no claim to this fund. It had been transferred to Boyce, and the only question is whether he held it as his own personal fund, or as a trust fund. In this the assignee has no interest. Equity treats that as done which ought to have been done, and thus merely regards these funds received by Boyce from Stanton before his bankruptcy as payments on his debt, and so applies them.

Nor is the plea of the statute of limitations of three years a bar to such decree. This is not rendered on an " action for the conversion of personal

property," but a suit to compel an application of payments, and so is not within the language of the statute. And if it were within this class of actions, the complainants in the amended bills have therein waived the tort and sued only for the value of the property received, and so would not be barred: *Kirkman* v. *Phillips*, 7 Heis., 222. Besides, the suit probably belongs to that class of cases within the peculiar and exclusive jurisdiction of courts of equity in which they refuse to recognize and apply the statutes of limitation: St. Eq. Jur., sec. 1521 and notes; 4 Kent's Com., page 180.

As between Boyce and other creditors with decrees or liens, it does not appear that the vendor's lien is entirely satisfied. But after applying to the balance reported to be due by the master in October, 1877, the proceeds of the Swann purchase as hereinbefore directed, Boyce will be entitled to satisfaction of the residue out of the proceeds of the sale of the other parts of the sixty-nine and a half acres in accordance with the decree of the chancellor of May, 1873, and May, 1874, and in the order therein provided for.

After applying the sums so received by Boyce to the satisfaction of his lien, he will be entitled to receive next the proceeds of the sales of the other lots not sold or contracted to sub-purchasers by Stanton before the decree of May 19, 1873, as therein decreed, and thus his lien will be satisfied, or if not satisfied his right of satisfaction will be exhausted, and he must look to Stanton personally or his assignee

in bankruptcy for any balance of purchase-money unsatisfied, as also for the other debts Stanton agreed to pay him out of the Swann fund.

The claims which Wolffe, as the agent and broker of Swann bought up, will be treated as satisfied out of the money of Stanton, and no longer existing as liens in favor of either the original creditors or their assignees. Since the fund was pledged for this purpose it must be regarded as so applied. The objection of Boyce that this cannot be declared in favor of the other parties because he alone has appealed, cannot avail. While the chancellor's decree declares Boyce entitled to hold these claims as assignee, it charges him with a much greater sum in favor of the other parties, wherein is included the sum used in buying up these very claims. The other parties had no reason to appeal. The appeal of Boyce brings up not only the question whether he was properly charged with these funds, but the inseparable one, whether the claims bought with them were his property or were satisfied. The reversal in his favor as to the fund requires also a reversal as to claims.

Next in order, after Boyce, comes the lien of the mechanics and furnishers. These of course lie only upon the particular lot on which were placed work or materials for Stanton. If possible, Boyce's lien must be satisfied out of the proceeds of lots on which there were no mechanics' liens; or if these must be resorted to for him, the encroachment must be in the inverse order of their liens, and his money must be taken out of the various funds so as, if possible,

to leave enough in each to satisfy the mechanics' and furnishers' liens thereon.

It is contended for some of them that, as their liens were not upon the twenty-four-acre tract, but other lots, and were prior in date to the sale to many of the sub-purchasers, the rule of sale in the reverse order of sub-purchase or incumbrance would require a resort to the lots of the junior sub-purchasers before coming upon their fund. Conceding this to have been the equity of the case at the date of the decrees of 1873 and 1874, and that those decrees are conclusive of the rights of the parties at that time, the order of sale prescribed in them cannot now be followed because of the change of ‘rights brought about by the subsequent consent decree of release in 1878. The mechanics and furnishers are embraced within the terms "all parties in these causes who have either liens or decrees." They, therefore, consented to Boyce releasing the twenty-four acres from his lien. The effect of this, as we have seen, was to release the lots of sub-purchasers. It would have postponed Boyce to the mechanics also, but for their consent to it. The decree itself, however, provides expressly that "by agreement of the parties aforesaid," i. e., the parties consenting, "this release is in nowise to affect * * priorities of the parties * * as to the remainder of said sixty-nine and a half acres." Having consented to the decree, the effect of which was the release of the lots of the sub-purchasers, the mechanics are estopped from now having these lots resorted to; and having agreed to preserve priority

between themselves and other parties with liens or decrees, they must submit to Boyce's original seniority of lien.  In case any questions of priority arise among them, or between them and other creditors or purchasers, in all cases where the bills have been filed within the year allowed by statute, their several liens have been placed, and will be so decreed from the date of furnishing materials or doing work under said contract.  This includes the lien of Kinsey, assignor to Gillespie & Co., and gives it priority as decreed by the chancellor.

Next in order of satisfaction come the liens of the general creditors in the order of their several attachments.  The equity of the sub-purchasers is still stronger against such of them as have no lien on particular lots, but only on Stanton's equity in the whole tract.  They joined in releasing the twenty-four acre lot, the proceeds of which were probably sufficient to satisfy their debts in addition to the vendor's lien; certainly with the proceeds of the other unsold lots added, they would have been sufficient without resorting to the lots of sub-purchasers, or the notes given therefor.  If, therefore, they had a prior lien over the purchasers, whose deeds were unregistered at the date of their attachments, they stood toward them in the same relation as did Boyce, and equity required of them, equally with him, that they should not release their security on property liable for their debt before the lots of the sub-purchasers, without crediting their debts with the value of their lien upon it at the date of the release.

The language of this consent decree: "But no rights or equity existing heretofore between parties of this suit or litigation shall in any manner be abridged or disturbed by this agreed decree," is relied on to avert this release of the sub-purchasers. This seems to be merely an expression of the agreement of the consenting parties rather than the decree of the court. But if it be taken as a part of the matter decreed by the chancellor, it will still be regarded as applying only to the consenting parties. Language employed in parts of the decree as here, seems to include all the parties to the consolidated causes, and the consenting parties probably intended not to disturb in the slightest their liens on the other parts of the sixty-nine-acre tract. But the whole decree construed together is a consent decree; and, in the absence of the clearest expressions showing the chanceller to be decreeing upon a hearing of the causes, the decree must be taken as limited in its effect to such parties as are present, admitting the facts and consenting to the expressed legal effect of them. Such expressions do not appear herein; and, therefore, we hold the consent decree did not in any manner affect the rights of the sub-purchasers, nor operate to preserve former liens against the equitable consequences of the release then consented to and received.

Nor is this equity of the sub-purchasers weakened by the fact that the creditors did not intend to release their liens from the lots bought by them, nor in their consent decree contemplate that such would be the result of the release. It is not by

their intention, but by the effect of their act, that the rights and equities of the parties must be determined. If they, or any of them, were mistaken, either as to the legal effect of this release of a part, or in trusting Stanton for the faithful application of the proceeds of the railroad lot, it is their misfortune, and cannot be visited upon the parties not participating in the mistake and release.

It is urged for the creditors that this relief cannot be given the sub-purchasers and their note-holders because they have not appealed. The decree of the chancellor was against Boyce, and afforded their lots ample protection. There was no necessity for an appeal on their part. The appeal of Boyce and the modification of the decree against them, puts their lots in jeopardy, and requires a consideration of the equities between them and the general creditor. The appeal of an unsuccessful defendant against all complainants will permit an adjustment of the equities between co-complainants in this court.

Nor would this equity be affected by the mere fact that some persons purchased *pendente lite.* The attaching creditors are to be regarded, after the decrees of 1873 and 1874, as second mortgagees of Stanton as to the whole sixty-nine and a half acres. Purchasers of a part, after a mortgage of the whole, are treated with the same consideration as those purchasing before, whose titles were unregistered and unknown. The mortgagee may not release a part to their prejudice, provided he have notice of their purchases. Notice to the mortgagee is essential to

the existence of this equity of the sub-purchaser. The consent decree of release, therefore, is a protection to all sub-purchasers, whose purchases were known to the attaching creditors, or of which they had constructive notice: Jones on Mort., sec. 723.

Registration has been uniformly held not to be notice of such purchase to a prior mortgagee, since he is not bound to be constantly investigating the register's books for subsequent transactions between his debtor and third persons: *Ibid.* But record evidence in these consolidated causes, as by bill, petition or answer, order of record, or purchase at a master's sale, under order in these causes, and confirmation thereof before the release, would be constructive notice to the general creditors and to Boyce; and the equity resulting from the release would inure to the benefit of such purchasers *pendente lite.* Unless, however, they have become parties to the suit under such pleadings as to enforce this equity, their lots will not be exempted from sale to satisfy the claims of the creditors.

Stanton, however, sold many of these lots after he had been enjoined from selling them on the suit of some of the creditors. The purchasers were bound to take notice of this. The sales by Stanton were void certainly as to the parties who obtained the injunction (*Greenwald* v. *Roberts*, 4 Heisk., 500), as they were at liberty to disregard them entirely. The release does not discharge these lots from the superior claims of the general creditors.

It is urged for the creditors that the consent

decree of release was made upon the express agreement that the proceeds of the sale of the twenty-four-acre tract should be faithfully applied to the discharge of the vendor's lien and the decreed liens of other creditors, and that Swann, Boyce and Stanton were all bound for this application of the fund. This is doubtless true as to Stanton. He admits, in his petition for delay of sale, filed September 12, 1876, that the sale to the receivers was to be confirmed only on that ground; and in his deed to Swann expressly warrants against these liens; his conduct and relation to the parties required it of him, as did also the fact that he received the purchase-money from Swann. But it is not true as to Boyce. No such express agreement on his part is shown. The consent decree contains no such agreement. On the contrary, the reason for the release is expressed in the admission that this trust has contributed its full share toward discharging the liens. The fund was not then in Boyce's hands, and he was not the surety of Stanton for the fulfillment of his promise. He is liable, as successor to Stanton, as constructive trustee, but only for the amount of the fund received by the assignment. Swann was no party to the suit, nor to the consent decree, nor to any such agreement as alleged, and not bound by any promise to see to the faithful application of the purchase-money. He was interested only in getting a good title. Stanton promised him this, and Swann retained part of the purchase-money to compel performance of the promise. Stanton obtained the release of the liens on the con-

sent expressed as aforesaid; and him only can the disappointed creditors hold for the performance of his promise.

For the attaching creditors it is also insisted that by the deed to Swann on September 14, 1877, for the twenty-four acre tract, Boyce waived his vendor's lien as to junior lien creditors upon the residue of the sixty-nine and a half acres. This would, perhaps, have been the effect of that deed had he thereby released said twenty-four-acre tract from his lien as vendor. But the deed expressly says: "Said twenty-four and four-fifteenth acres is not discharged and free from any lien I may have had as vendor." The relation of these parties thus remained after the deed just as they were before it; and, therefore, this contention of the general creditors cannot be sustained.

The general creditors also insist that Boyce's lien should be credited with $25,000 paid him by Stanton in May, 1877, as admitted by him in his deposition in the Duffy case. He admits the receipt of this sum in the spring or summer of 1877, but says it was embraced in the $72,000 credited as of September following; and we see nothing in the record to contradict this statement and authorize a disregard of the master's report, unexcepted to in this point, in which this sum is so reported. The credit cannot, therefore, be allowed.

Nor can Boyce be denied credit for sums paid by him out of his own means on taxes accrued before January, 1877, on the ground that the payment was voluntary and officious. His contract with Swann

bound him to discharge these tax liens as to the twenty four-acre tract; besides, they were a prior lien over all, and in the discharge of it all encumbrances were interested on all unsold parts of the sixty-nine and a half acres. It results from this, of course, that the holders of notes of sub-purchasers who bought from Stanton pending the injunction, as well as the sub-purchasers, must be postponed to liens of those creditors who had injunction against Stanton at the time of their purchases. Such note-holders as have priority, as well as all the creditors, must look to the proceeds of the sales of the property sold by order of the court instead of the lots themselves, the sales having been properly made, and the fund being still within the control of the court in these causes. The legal question as to whether the date of registration or of sale is to determine priority as between the sub-purchasers and creditors, which is otherwise difficult of solution, in view of our decisions sustaining a mere delivery of a title bond in preference to a subsequent attachment levied upon the land as that of the obligee making this parol transfer, and of our statutes requiring registration of all deeds of conveyance to give them validity against creditors, seems to be settled in this case as to all persons, and their privies, who were parties to the suit at the time of the decrees of May, 1873, and May, 1874. Both these decrees concur in fixing the order of priority according to the date of sale. These decrees are valid and unreversed; nor is this proceeding one in which they could be reversed, if erroneous. By them,

therefore, all parties to them are concluded. And in
view of the other adjudications as to the purchasers
pending the injunction, who became parties after these
decrees, it does not seem necessary to rule upon this
point. Indeed, it is doubtful if the above ruling is
necessary in view of the release of the lots of pur-
chasers before the attachment and injunction. But,
if necessary, it will be applied in the decree in the
case.

The attaching creditors urge that they should not
be bound by their consent decree because of their
ignorance at the time of conssnt of the transactions
between Stanton, Boyce and Swann in regard to the
purchase-money. Conceding that their supplemental
bill is sufficient in form to authorize the setting aside
of that decree, the reason given does not warrant it.
The complaint is not of ignorance of the value of
the lot, but of the disposition of the proceeds. They
knew of the conveyance by Boyce to Swann long
before. They knew of the payments made on the
purchase price at the date of the deed; they admit
that the payments of which they had knowledge were
sufficient to warrant the release of the twenty-four-
acre lot. It is incredible that their knowledge that
more had been paid, or that Boyce had received part
of it, would have caused them to withhold their
consent. Their mistake, if any they made, was not
of fact, but of law—not of the amounts paid, but of
the effect of their release.

In regard to the question of determining the date
of notice from registration, if the same shall become

material in enforcing a decree under this opinion, the same will be declared to take effect from the date the deeds were noted for registration as prescribed by law: Code, secs. 529, 2888. In *Miller* v. *Estill*, Meigs, 483, it was ruled proper to prove by parol the date of the registration of a deed where the register neglected to state it on his books. And in *Baldwin* v. *Marshall*, 2 Hum., 118, it was held that the register might correct the registry so as to conform it to the original, and also the date of the same might be proven by parol. When, therefore, there was doubt, as in the case of the bond to Gillespie, of the date of registration, it was proper to prove, either by official certificate of the register of a copy from his note book, or by his deposition, the date when the same was noted for registration, and it would take effect from that date.

On behalf of Gillespie & Co., it is urged they should not be bound by the consent decrees because at the date of their entry three of the four members of the firm were dead. That cannot impair the decree. The rights of the partnership in the litigation survived to the remaining member of the firm; and the power and authority of consenting to the decree were also his. The parties interested in this Gillespie debt were, therefore, bound by this consent, and the decree based thereon.

It is scarcely necessary to say, though exception may demand it, that the attaching creditors have no liens upon that part of the sixty-nine and a half acres laid off in streets and alleys at the time of

filing their attachment bills. These had been dedicated to the public by Stanton, and could not, therefore, be summarily reclaimed by him, nor seized by his creditors.

The objection of Boyce that proper discrimination between his acts as executor and in his own right, will make a difference in the result of the litigation, is not well taken. Boyce sold as executor; the court decreed he had a right to sell as executor; he conveyed as executor, and covenanted that he had a right so to convey. It goes without saying, therefore, that he had the right to receive the purchase money, and dispose of the same, answerable of course to the legatees, on his administration bond, for the proper disposition thereof.

The case of D. J. Duffy against Stanton and others was heard, together with these consolidated causes, and Duffy was in the decree postponed to the other attaching creditors. Of this joint hearing and postponement his counsel complains in argument, insisting that this cause should have been heard separately, and Duffy given priority over the other attaching creditors in the fund resulting from the sale of the interest of Stanton in the entire sixty-nine and a half acres, because by his bill he had specifically attached the fund resulting from the sale of the twenty-four-acre lot, as the property of Stanton, in the hands of Swann and Boyce, and thus gained a prior specific lien. But on examination of Duffy's bill, it appears that he prayed that his case might be consolidated with the consolidated cause of Boyce

Boyce v. Stanton.

against Stanton, and also in his bill he only prays for satisfaction out of the fund after the claim of Boyce and the other prior liens and encumbrances have been fully paid off and satisfied. In the view of the case we have taken, the fund in Boyce's hands was a trust fund for the creditors in the consolidated causes, and therefore Duffy can only have any surplus remaining · after their claims are satisfied.

A decree will be entered in accord with this opinion, substantially confirming the report of the Referees, and in some material particulars reversing the decree of the chancellor. The. costs will be adjudged as recommended by the Referees, and the cause remanded for the purpose of executing the decree as directed.

PETITION TO REHEAR.

Upon petition to rehear, INGERSOLL, Sp. J., said:

Complainant, Boyce, has filed a petition to rehear one branch of this complex, consolidated cause, which, with the answers and his replication and rejoinder, has received careful consideration.

1. The ruling specially and most earnestly complained of is that which results in charging Boyce with that portion of the proceeds of sale of the twenty-four-acre lot to Swann, which came to his hands, and requiring him to credit the same on his purchase-money debt. The ground of the complaint is, that: "The opinion of the court in these causes, rendered at the present term, in effect, reverses and

26—VOL. 15.

ignores the opinion and decree of this court in these causes in 1880;" and this is error, as being in violation of the uniform rule, that "after adjournment, this court has no power to review or rehear its own decisions in a particular case."

The case was this:

Boyce had sold a tract of land to Stanton, retaining a lien for unpaid purchase-money. Stanton's creditors had attached his equitable interest in the whole, and in different parts of the tract. Boyce had filed his bill to enforce his vendor's lien. After consolidation of the cases, a decree of sale had been made, for the satisfaction first, of the vendor's lien, and then of the claims of the attaching creditors. The sale was for a long time delayed at the urgent request of Stanton, and by consent of the creditors, on Stanton's representation that he was negotiating privately a sale of the part of the land for a sum sufficient to pay all the debt, and his promise to them that it should be faithfully applied to their payment. After much delay he effected the sale, and paid part of the proceeds as promised; but some he diverted to other purposes. The residue, amounting to several thousand dollars, Boyce, with knowledge of Stanton's promise aforesaid, and the creditor's reliance thereon, and the consequent delay of sale, had, on the transfer of Stanton, received from Swann, the purchaser, and applied to his own private gain, instead of crediting it upon his vendor's lien, or paying it to the other creditors. By the recent opinion the court held that this sale fund was

a trust fund, for the uses promised by Stanton; that Stanton was an implied or constructive trustee, bound to apply it as promised; and that Boyce, receiving a portion with knowledge of the facts, was chargeable with it as a trust fund, even though he contracted for it in private speculation; and therefore he must credit the sum received on his vendor's lien.    This is the holding said to be "in direct conflict with the former ruling, reversing it without mentioning it."

To establish this, citation is made, not from the former decree, but only of a single sentence, wrested from the midst of a ten-page opinion, and separated from its context and from all the other kindred parts of the opinion.    It is as follows: "We are of opinion that notwithstanding the indebtedness of Stanton, the existence of attachment liens, vendor's liens, etc., against him, it was legitimate for Boyce to buy the contracts of Swann, upon such terms as the parties might in good faith agree."

From this isolated excerpt is drawn the conclusion that there was a former ruling or adjudication that the attaching creditors could not call Boyce to account for proceeds of the Swann purchase transferred to him by Stanton.    But in the decree of 1880, which is *the* evidence of the conclusion and adjudication of the court in the cause, upon the matters in issue, there is no sentence or expression to this effect, or even looking in this direction.    On the contrary, the adjudication is expressly refused in the following terms:  " The court is of opinion that there is in the

record no sufficient pleadings or averments and issues made by appropriate pleadings to authorize the matters and things in relation to the waiver of the vendor's lien, * * * as well as the matters of account ordered by said decree in relation to purchase-money or proceeds of sale of the twenty-four acres of land specified therein as came to the hands of respondent, Boyce, and so much of the chancellor's decree as declares said lien satisfied and orders said account, * * * *is for that reason reversed.* * * * But from the facts developed in the record, the court is satisfied that the matters and things embraced in such parts of the chancellor's decree as are here reversed, are proper and legitimate matters to be enquired into and adjudicated, * * * under a proper state of pleadings and issues made for that purpose, as indicated by the opinion delivered in this cause; these consolidated causes are therefore remanded" for appropriate pleadings and proceedings "to bring said matters properly before the court for adjudication."

Instead of adjudging Boyce not liable for these funds, this was an express reservation of the question, until it should be presented for decision on proper pleadings and issues. And this would seem to be conclusive of this matter of former ruling by the court. But recurring to the opinion, and conceding to it, for the nonce, the same force and effect as to the decree of the court, and considering the single excerpt, relied on by petitioner to show a former ruling adverse to the recent opinion, in connection with other expressions on the same subject, and the

error of relying on the single sentence of the opinion for the judgment of the court becomes obvious. Judge Turney said: "The chancellor decreed that all the attaching creditors, * * * consented to the sale, * * * upon the faith of having, and with the right to have, the purchase-money paid therefor honestly applied, first to the extinguishment of the vendor's lien, and next, the extinguishment of the other debts. * * We are not prepared, by the facts of the record, to concur with or dissent from the chancellor. * * * There is enough in the record to indicate the probability that Boyce has in his hands, or under his direction, funds belonging to Stanton, and for which Stanton's creditors have a right to demand of him an account. * * * Stanton had procured a postponement of the sales upon the ground that he had effected a sale to Swann, and that the proceeds derived from Swann were to be applied to the debts, etc. The creditors agreed to the postponement on condition that they should be so applied. * * * The record does not show what connection, if any, Boyce had with this arrangement, *and we therefore intimate no opinion as to its effect upon his rights under the transfer from Stanton to him.* The matter may be inquired into under a proper procedure for that purpose in the chancery court."

From these and other expressions in the opinion, it would seem clear that the opinion and decree concur in correctly expressing the determination of the court not to rule upon the validity or effect of Boyce's

purchase from Stanton of the Swann fund, upon the record as it then stood, because, in the language of the opinion, there was "no pleading authorizing any action of the chancellor upon questions of usury, speculation and fraud;" the causes were therefore remanded and the pleadings filed and proof taken, and the record on which the cause has now been heard and determined.

But if, as petitioner urges, the court should restrict itself in this matter to the single sentence quoted, and decide the question upon it rather than upon the whole opinion, or upon the decree, it is difficult to see how the result would be changed. The utmost claimed for Boyce upon that quotation is that he could buy from Stanton the Swann contracts "upon such terms as the parties might in good faith agree." Stanton could not "in good faith" sell to Boyce for his own private advantage, because he had promised, on the consideration of delay, to appropriate these proceeds from the Swann contracts to the payment of the debts sued on in these causes. Boyce, having knowledge of this promise, and of the reliance of the creditors thereon for payment of their debts, and occupying toward them the relation of a first mortgagor to a second incumbrancer, could not, in legal "good faith" toward them, engage in a contract by which they should be deprived of these funds, and he gain them for his own profit. Nor was his duty to apply these trust funds coming to his hands to the purposes of the trust, according to Stanton's agreement, in any way affected by the consent decree,

whereby the creditors released the twenty-four-acre tract from their liens, for they therein make this express reservation : "This release is not to have any reference to the proceeds of the sale of the same, or the rights of any one thereto, or *the liability of any one therefor.*" Equity and good faith require that Boyce hold the remnant of the Swann fund acquired by him with notice of its character, just as Stanton, his assignor, held it. in trust for the creditors to whom it was promised : 1 Perry on Trusts, sec. 217.

And it is not material to inquire whether the consideration Boyce paid for it were sufficient and valid. In the section above cited, Mr. Perry states the doctrine declared and recognized in numerous cases, and without conflict, to be : "Even if one pay a valuable consideration, with notice of the equitable rights of a third person, he shall hold the property subject to the equitable interests of such person. * * * This rule applies not only to express trusts * * but also to constructive trusts, or those trusts that arise from fraud."

A majority of the court are of opinion that this holding does not conflict with the former opinion and decree of the court, and that the equitable doctrines of trust above stated were properly applied to the transactions of Boyce with the Swann fund, and therefore the recent opinion is adhered to on this point.

Whether under this ruling Boyce is chargeable with the proceeds of twenty-eight or of only fourteen

bonds is rather difficult of determination. A majority of the court think that he should be charged only with the proceeds of fourteen bonds and such interest as he actually received on all the bonds under his assignment from Stanton; and that the debts and incumbrances paid off with the other fourteen bonds, which, though Boyce had received them from Swann, and taken Plock's receipt for them, had never actually come to his hands, should be treated as satisfied with the funds of Stanton. A decree will, therefore, be made accordingly. This will dispose of the questions made with regard to the Watkins debt and other debts paid out of these fourteen bonds. The R. Inge Smith debt was paid out of the thirty-four bonds, and need not, therefore, be noticed further.

Boyce urges that if held liable as trustee, he should have compensation as such for attorney's fees and expenses out of the fund to the extent of, say $10,000. Courts of equity often make such allowances, sometimes even when the position of trustee is voluntarily assumed, if the trustee has been diligent and faithful to his trust. But Boyce ignored this trust, denied it, sought to appropriate the funds to his own use, and thus deprive the creditors of them, to whom they had been promised, and to whom in equity they belonged; the trust has been forced upon him by these suits against his continued resistance even to this time, and as a consequence he seems to stand before the court in the attitude of an executor *de son tort.* He has all the liabilities, but none of the

privileges of a regular trustee: Williams on Ex'rs, 255. The funds which he is compelled to account for as trust funds he cannot be allowed to apply to his indemnity for attorney's fees and expenses: *Sharp* v. *Caldwell,* 7 Hum., 417–18.

A majority of the court are also of opinion that the report of Referees should be modified as to the matter of costs, so that Boyce should be charged with only one-third of the costs of this court instead of one-half, as recommended by the Referees, and that the attaching creditors should pay the other two-thirds; in other particulars the costs will be disposed of as recommended in the Referees' report.